**Ricardo Lloyd JOHNSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 05–89–01086–CR.

Court of Appeals of Texas, Dallas.

Sept. 30, 1993.

710

John D. Nation, R.K. Weaver, Dallas, for appellant.

Robert P. Abbott, Dallas, for appellee.

## OPINION ON REMAND

LAGARDE, Justice.

The trial court convicted Ricardo Lloyd Johnson of aggravated possession of cocaine with intent to deliver and assessed punishment at fifty years' confinement. On original submission, this Court held that, based solely on the Fourth Amendment of the United States Constitution, the trial court erred in overruling Johnson's motion to suppress because the police officers had neither reasonable, articulable suspicion nor probable cause to make a warrantless search and because there were insufficient specific articulable facts to justify a temporary detention. Further, we held that Johnson did not voluntarily abandon the contraband. Consequently, we reversed the trial court's judgment and remanded the cause for further proceedings. *Johnson v. State*, 802 S.W.2d 325 (Tex. App.—Dallas 1990), *vacated*, 825 S.W.2d 126 (Tex.Crim.App.1992). After quoting the following portion of this Court's majority opinion, "The flaw in the State's case is that none of the circumstances preceding the officer's detention of appellant justified a reasonable suspicion that he was involved in criminal conduct," the court of criminal appeals vacated this Court's judgment and remanded this cause for our reconsideration of Johnson's suppression argument "by reviewing the totality of the circumstances of appellant's arrest in light of *California v. Hodari D."* *Johnson v. State*, 825 S.W.2d 126, 127 (Tex. Crim.App.1992); *see California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

Pursuant to *Robinson v. State,* 790 S.W.2d 334, 336 (Tex.Crim.App.1990), we allowed re-briefing. Johnson now challenges the overruling of his motion to suppress under the Fourth Amendment of the United States Constitution and article one, section nine of the Texas Constitution. Reviewing the totality of the circumstances of Johnson's arrest, we now determine that Johnson was "seized" under the Fourth Amendment and article one, section nine of the Texas Constitution when he dropped the contraband; thus, he did not voluntarily abandon the contraband. However, we further conclude that the police had probable cause to arrest him for an offense committed within their view and that the contraband was recovered in a search incident to that lawful warrantless arrest. Accordingly, we hold that the trial court did not err in denying Johnson's motion to suppress. We also hold that his sentence of fifty years' imprisonment does not constitute cruel and unusual punishment. Accordingly, we overrule both points of error and affirm the trial court's judgment.

## FACTUAL BACKGROUND

Dallas Police Officer Charles Ray Bailey testified that at about 1:45 p.m., he and his partner, Police Corporal Clifford E. Lewis, were conducting a foot patrol of an apartment complex located in a high-crime area noted for drug transactions, some of which occurred in public view. As the officers approached a breezeway, Bailey "heard someone say that there was a large stash of marijuana being kept in a house somewhere." Bailey heard two distinctive voices discussing the matter, but he could not see any of the persons in the breezeway. Bailey did not recall anything else being said during the conversation. When Bailey and Lewis walked around the corner of the breezeway, Johnson and two other men immediately ran. Bailey noticed Johnson was carrying a "purplish thing," later identified as a Crown Royal bag. When the three men ran away from the officers, Bailey chased after Johnson. During the chase, Bailey twice ordered Johnson to stop running. Bailey noticed Johnson fumbling with what appeared to be a handgun, twice ordered Johnson to drop the weapon, and drew his own weapon in response. Shortly thereafter, the Crown Royal bag and the weapon either became dislodged or were dropped by Johnson. Johnson then stopped. Lewis appeared, arrested Johnson, and recovered the Crown Royal bag containing 162 envelopes of suspected contraband,[1] a small amount of marijuana, and $1454.10. Bailey recovered the loaded 9-mm pistol that Johnson dropped. Bailey testified that, in his experience, handguns are used during drug transactions and that, before he entered the breezeway, it was reasonable to suspect that someone might be armed. After the officers had read Johnson his rights, he said, "You didn't find this on me. This was not found on me."

Lewis testified that, while conducting a patrol of an apartment complex in a high-crime area, he overheard a conversation in a breezeway "about a stash [of marijuana] that somebody had somewhere." Lewis could not see who was talking, but he heard two voices. When Lewis and Bailey entered the breezeway, three men began to run. Lewis instructed Bailey "to get the gentleman with the bag in his hand." When Lewis saw Bailey chase Johnson around the end of the building, Lewis ran back through the breezeway and up to the end of the building to put himself in front of Johnson. As Johnson came around the end of the building, Lewis saw Johnson "fumbling (indicating) with his front, and the weapon was coming out of the front, or it was already out. I can't remember which." Lewis then drew his gun and yelled at Johnson to stop and drop the gun. "[A]t that point in time the gun and the bag was [sic] dropped." The officers then "converged on him into [sic] the next breezeway." Lewis was only fifteen feet away from Johnson when he saw Johnson "fumbling with the weapon." After they arrested Johnson, Lewis searched the bag and found the cocaine, marijuana, and money in it. When the officers searched Johnson, they did not find any drug paraphernalia on him. Lewis further

---

1. The parties stipulated that the contents of eight envelopes were tested and found to be crack cocaine.

testified that, prior to entering the breezeway, he "had a reasonable belief ... that the crime was about to be committed." He thought that he had sufficient grounds to make an investigatory detention and that, once Johnson began to run, Johnson was not free to leave the area.

Johnson filed a pre-trial motion to suppress. Because trial was before the court, the trial judge agreed to rule on Johnson's motion at the close of the evidence at the guilt-innocence phase of trial. The trial court overruled Johnson's motion, stating that the officers were entitled to detain and subsequently to arrest and search Johnson.

Johnson did not testify at the guilt-innocence phase of trial but did testify at the punishment hearing. Johnson stated that he was at the apartment complex to return a car he had borrowed. He was in the breezeway with a man who was telling him about some marijuana the man's son had found in a refrigerator. When Johnson saw the man run away, Johnson panicked, turned around to run, and fell down. The police then arrested him. Johnson denied having a gun, holding a Crown Royal bag, or having drugs in his possession. He also denied fleeing from the police officers. Johnson stated that the approximately $1400 the officers found was his,[2] however, and that he had intended to use $1000 of the money to purchase T-shirts for resale.

Johnson sought probation, arguing that there was no actual delivery and that although there was testimony of a gun being present, there was no testimony that it was pointed at or used against the police officers. The State took issue with Johnson's characterization that Johnson did not threaten the officers or their lives. At the conclusion of the arguments, the trial court stated, "and the Court also takes it very seriously when the defendant has a gun and tries to use it on an officer...."

## MOTION TO SUPPRESS

### Standard of Review

■ At a suppression hearing, the trial judge is the sole judge of the witnesses'

credibility and the weight given their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990). The trial judge may accept or reject any or all of the witnesses' testimony. *Johnson v. State,* 803 S.W.2d 272, 287 (Tex.Crim.App.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1078 *overruled on other grounds, Heitman v. State,* 815 S.W.2d 681, 685 n. 6 (Tex.Crim.App.1991). We do not engage in our own factual review. We only consider whether the trial court improperly applied the law to the facts. *See Romero,* 800 S.W.2d at 543. Absent a showing of an abuse of discretion, we do not disturb the trial court's findings. *Maddox v. State,* 682 S.W.2d 563, 564 (Tex.Crim.App.1985). We view the evidence in the light most favorable to the trial court's ruling. *Daniels v. State,* 718 S.W.2d 702, 704 (Tex.Crim.App.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 252 (1986), *overruled on other grounds, Juarez v. State,* 758 S.W.2d 772, 780 n. 3 (Tex.Crim.App.1988). If the evidence supports the trial court's ruling, we do not disturb that ruling. *Johnson,* 803 S.W.2d at 287. We must uphold the trial court's ruling if it can be upheld on any valid theory, regardless of whether the State argued it in the trial court or on appeal. *See Lewis v. State,* 664 S.W.2d 345, 347 (Tex.Crim.App. 1984) (disposing of motion to suppress on grounds of appellant's lack of standing despite fact that State did not argue lack of standing at trial or on appeal).

### Burden of Proof on a Motion to Suppress

■ When a defendant seeks to suppress evidence on the basis of the right to be free of unreasonable search and seizure, the burden of proof is initially on the defendant. *Russell v. State,* 717 S.W.2d 7, 9 (Tex.Crim. App.1986). In *Russell,* the court of criminal appeals further explained the burden of proof as follows:

As the movant in a motion to suppress evidence, a defendant must produce evidence that defeats the presumption of proper police conduct and therefore shifts

---

**2.** Officer Lewis testified that he found the money in the Crown Royal bag, which Johnson denied having. Johnson testified that the money was in his pocket when the police arrested him.

the burden of proof to the State. A defendant meets his initial burden of proof by establishing that a search or seizure occurred without a warrant.

Once a defendant has established 1) that a search or seizure occurred and 2) that no warrant was obtained, the burden of proof shifts to the State. If the State produces evidence of a warrant, the burden of proof is shifted back to the defendant to show the invalidity of the warrant. If the State is unable to produce evidence of a warrant, it must prove the reasonableness of the search or seizure.

*Russell*, 717 S.W.2d at 9–10 (citations and footnote omitted). However, the State is not required to prove the propriety of the search beyond a reasonable doubt. *Lalande v. State*, 676 S.W.2d 115, 117 (Tex.Crim.App. 1984).

Johnson met his initial burden of proof of overcoming the presumption of proper police conduct by presenting evidence that the police searched and seized the Crown Royal bag without a warrant. The officers admitted that they did not have a warrant. Accordingly, the burden of proof was on the State to prove the reasonableness of the search and seizure.

### The Parties' Arguments

Although Johnson's exact arguments are unclear from the briefs, we interpret them as asserting the following:

(1) that Johnson was "detained" or "stopped" under the Fourth Amendment and article one, section nine of the Texas Constitution either when the officers initially confronted him in the breezeway or when the officers chased him and made a show of authority by shouting at him to stop;

(2) that at the time of this detention or stop, the officers had neither probable cause to arrest Johnson nor sufficient reasonable, articulable suspicions to stop or detain him; and

(3) that all of Johnson's actions after this illegal detention or stop were the result of police misconduct, including Johnson's abandonment of the gun and the Crown Royal bag containing the drugs.

The State asserts that the officers had not "seized" Johnson under either the Fourth Amendment or article one, section nine until after he had "voluntarily abandoned" the gun and the bag containing the drugs. Therefore, the State argues, Johnson's abandonment of the contraband was not the result of police misconduct. Alternatively, the State argues that the officers had sufficient reasonable, articulable suspicions to detain Johnson.

The main issue, then, is whether Johnson was stopped, detained, arrested, or in any other manner seized without the requisite level of suspicion by the officers at the time the officers searched for and seized the gun and the drugs. Johnson suggests the following points at which seizure may have occurred in this case: when the police made their presence known by walking into the breezeway; when the police chased Johnson shouting "stop" at him; when the police drew their guns and shouted at Johnson to "drop the gun"; when Johnson dropped the gun and the Crown Royal bag; or when Johnson stopped running. Therefore, as the court of criminal appeals phrased it, "The questions to be decided are, when did the officer have legally sufficient reason to detain appellant, and when did he need it?" *Daniels*, 718 S.W.2d at 704.

Because Johnson has provided substantive analysis and argument on the federal and state constitutional grounds, we address each ground separately. *See Heitman v. State*, 815 S.W.2d 681, 690–91 n. 23 (Tex.Crim.App. 1991) (declining to blindly follow the Supreme Court's decisions interpreting the Fourth Amendment in addressing the legality of an inventory search under article one, section nine of the Texas Constitution).

### Presence of the Officers

Johnson argues that he was seized from the moment the officers made their presence known by walking into the breezeway. Both the Fourth Amendment and article one, section nine of the Texas Constitution guarantee Johnson the right to be free from unreasonable seizures or searches. *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9.

A stop or detention of an individual by the police violates these guarantees only if: (1) the stop or detention constitutes a "seizure" and (2) the seizure is unreasonable. In his brief on the first appeal before this Court, Johnson incorrectly said, "One of the hallmarks of an investigative detention is that the person may refuse to cooperate and go on his way." As noted above, the detention must constitute a seizure under the Fourth Amendment or article one, section nine before the rights of the person could have been violated. Under the Fourth Amendment, a person has not been seized by the police *unless* the officer has restrained the person's freedom to walk away. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16. Thus, correctly stated, the hallmark of an investigative detention is that the person is *not* free to walk away. *See Galitz v. State*, 617 S.W.2d 949, 957 (Tex.Crim.App.1981).

The Supreme Court later made the determination of seizure an objective test: "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion; test adopted by majority of Court in *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984)). The "reasonable person" in this test is a hypothetical innocent reasonable person: "The potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position." *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 519 n. 4, 103 S.Ct. 1319, 1335 n. 4, 75 L.Ed.2d 229 (1983) (Blackmun, J., dissenting)).

Under Texas law, the issue of when one is "seized" is complicated by the existence of a pre-*Terry* statute defining arrest. "A person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant." Tex. Code Crim.Proc.Ann. art. 15.22 (Vernon 1977). A statutory arrest occurs "when a person's liberty of movement is restricted or restrained." *Burkes v. State*, 830 S.W.2d 922, 925 (Tex.Crim.App.1991); *Amores v. State*, 816 S.W.2d 407, 411 (Tex.Crim.App. 1991); *Hoag v. State*, 728 S.W.2d 375, 379 (Tex.Crim.App.1987). Article 14.03(a)(1), first enacted three years before *Terry*, permits an officer to "arrest" a person found in a suspicious place and under circumstances reasonably showing such a person to be guilty of a felony. Act of May 27, 1965, 59th Leg., R.S., ch. 722, 1965 Tex.Gen.Laws 317, 362 (now Tex.Code Crim.Proc.Ann. art. 14.-03(a)(1) (Vernon Supp.1993)). Such an arrest requires "the legal equivalent of constitutional probable cause." *Amores*, 816 S.W.2d at 413 & n. 9. A stop is a seizure that is less intrusive than a full arrest. *Ebarb v. State*, 598 S.W.2d 842, 849 (Tex.Crim.App.1979) (op. on reh'g). An investigative detention occurs when the police intrude on the freedom of a citizen who has been stopped for further investigation. *See Daniels*, 718 S.W.2d at 705. In *Crockett*, the court noted that "*Terry* and its progeny apply only to seizures falling 'far short of the kind of intrusion associated with an arrest.' " *Crockett v. State*, 803 S.W.2d 308, 311 n. 8 (Tex.Crim. App.1991) (quoting *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979)). From these cases, and a host of cases containing similar language, we understand a "seizure," for purposes of article one, section nine, to occur when the police have intruded on the freedom of a citizen by momentarily detaining the person. The mere approach of police officers that does not interfere with one's freedom of movement and causes only minimal inconvenience and loss of time is not a seizure. *Stewart v. State*, 603 S.W.2d 861, 862 (Tex. Crim.App. [Panel Op.] 1980); *cf. Michigan v. Chesternut*, 486 U.S. 567, 569, 574–75, 108 S.Ct. 1975, 1977, 1980, 100 L.Ed.2d 565 (1988) (police driving down street without flashing lights or sounding siren was not a

show of authority such that a reasonable person would not feel free to leave).

When the officers walked around the corner into the breezeway, they did nothing that would lead a reasonable innocent person to believe that he was not free to leave. Their mere presence in this case did not constitute a show of authority. The officers' mere presence in no way intruded on Johnson's freedom by momentarily detaining him. Thus, Johnson was not seized under the Fourth Amendment or article one, section nine when the officers made their presence known by walking into the breezeway and within the view of Johnson and the other two men.

### Uncomplied-with Show of Authority by the Officers

Johnson next argues that he was seized when the officers made a show of authority that would lead a reasonable person to believe that he was not free to leave, even though Johnson did not comply with the show of authority and fled. The show of authority consisted of the officers chasing him and shouting at him to stop.

### A. United States Constitution

Under the Fourth Amendment, the law is clear that an uncomplied-with show of authority does not constitute a seizure. In *California v. Hodari D.*, the United States Supreme Court held that a citizen is seized if (1) he is subjected to a show of authority and yields or (2) law enforcement officers apply physical force to limit his movement. *Hodari D.*, 499 U.S. at 626, 111 S.Ct. at 1551. The Court assumed for purposes of the opinion that the officer's pursuit was a "show of authority" calling upon Hodari to halt and held that an uncomplied-with show of authority, even if it involves pursuit by law enforcement officers, does not constitute a seizure under the Fourth Amendment.[3] *Id.* at 625,

111 S.Ct. at 1550. There is no seizure when a law enforcement officer yells "Stop, in the name of the law" at a person who continues to flee. *Id.* at 626, 111 S.Ct. at 1550.

Johnson immediately fled when the officers turned the corner of the breezeway. Officer Bailey chased Johnson. Although Officer Bailey ordered Johnson to stop running, Johnson did not then stop but continued to flee. Because Johnson did not comply, the officers' show of authority of chasing Johnson and shouting at him to stop did not constitute a Fourth Amendment seizure of Johnson.

### B. Texas Constitution

Next, we must determine whether the uncomplied-with show of authority constituted a seizure under article one, section nine of the Texas Constitution. We initially note that the State contends that Johnson cannot brief his state constitutional arguments for the first time on remand. At the time of the first submission of this case before this Court in October 1990, Texas courts interpreted article one, section nine of the Texas Constitution the same as the Fourth Amendment of the United States Constitution. *See Eisenhauer v. State*, 754 S.W.2d 159, 164 (Tex. Crim.App.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988), *overruled in part by Heitman v. State*, 815 S.W.2d 681, 690 (Tex.Crim.App.1991). Thus, at that time, there was no need for an appellant to separately brief federal and state constitutional grounds. Following the court of criminal appeals' decision in *Heitman*, this is no longer true. *See Heitman*, 815 S.W.2d at 690 (Texas courts are not bound by Supreme Court's interpretation of Fourth Amendment in analyzing article I, section 9). We see no reason why, in light of the change in the law since original submission, we should not allow Johnson to brief his state constitutional grounds on remand.[4] *Cf. Cuevas v. State*,

---

**3.** Johnson argues that *Hodari* is inapplicable to cases involving only an investigatory detention because *Hodari* does not purport to define when an investigative detention has occurred. Because *Hodari* defines when a seizure under the Fourth Amendment (which includes investigative detentions) has not occurred, it is applicable to

show that no investigative detention has occurred.

**4.** We note that, on original submission, the State conceded that Johnson was seized when Officer Bailey ordered him to stop running. After *Hodari*, however, the State changed its position. We find no basis to allow the State, but not

641 S.W.2d 558, 563 (Tex.Crim.App.1982) (objection not a prerequisite to raising point on appeal when right was not established at time of trial).

In *Heitman*, the court of criminal appeals placed on the intermediate courts the duty to interpret article one, section nine of the state constitution independently of the federal constitution. Although a noble and popular concept, it is, nonetheless, a complex undertaking fraught with important issues at every point. Yet, the court of criminal appeals gave little guidance in proceeding through this exegetic morass. *See Heitman*, 815 S.W.2d at 691 (McCormick, P.J., dissenting); *see also Autran v. State*, 830 S.W.2d 807, 817 (Tex.App.—Beaumont 1992, pet. granted) (Walker, C.J., concurring) ("By adopting the doctrine of 'independent state grounds,' without directions, the fourteen courts of appeal[s] have been parachuted into the Okefenokee Swamp, at night, without a compass.").

Despite the paucity of clear instructions on state constitutional interpretation in *Heitman*, other than the statement that Texas will not blindly follow the United States Supreme Court lockstep, *Heitman* contains the following, marginally helpful, statements on the subject:

> Merely following Supreme Court decisions ignores state precedent that existed before the comparable federal right was applied to the states.

> \* \* \* \* \* \*

> ... [O]ur state constitution is a doctrine independent of the federal constitution and its guarantees are not dependent upon those in the federal constitution. The wording of our constitution is not identical to that of the federal constitution, although the rights and provisions are similar....

> \* \* \* \* \* \*

> ... [A] reason to interpret a state right more broadly than a federal right may be that the state constitutional guarantee is cast in terms that allow a far broader interpretation than the corresponding federal constitutional protection....

> \* \* \* \* \* \*

> ... [E]ven when the wording of the federal constitution is identical to the state constitution, the state has the power to give more protection to individual rights than provided by federal law.

> \* \* \* \* \* \*

> ... [I]t is, we believe, significant that our Bill of Rights is the first article in our state constitution.... Such placement indicates the degree of importance of these provisions to the drafters of the constitution and the citizens of this state, as opposed to the federal Bill of Rights which was *amended to* the end of the federal counterpart.

*Heitman*, 815 S.W.2d at 689–90 (footnotes omitted). We will examine each of these factors in construing article one, section nine.

### 1. Historical Application of Article One, Section Nine

One of the best historical analyses of article one, section nine is found in Judge Clinton's concurring opinion in *Brown v. State*, 657 S.W.2d 797, 799–807 (Tex.Crim.App.1983) (Clinton, J., concurring), joined by Presiding Judge Onion and Judge Miller. *See* James C. Harrington, *The Texas Bill of Rights and Civil Liberties*, 17 Tex.Tech.L.Rev. 1487, 1543–44 (1986). Judge Clinton notes that, before the Fourth Amendment was made applicable to the states through the Fourteenth Amendment, the Texas Court of Criminal Appeals did not interpret article one, section nine lockstep with the United States Supreme Court's interpretation of the Fourth Amendment. For instance, in *Welchek v. State*, the court of criminal appeals rejected the federal exclusionary rule read into the Fourth Amendment by the Supreme Court and decided that evidence seized in violation of article one, section nine could be used against the defendant at trial. *Welchek v. State*, 93 Tex.Crim. 271, 247 S.W. 524, 529 (1922); *see Brown*, 657 S.W.2d at 803–04 (Clinton, J., concurring).

After *Welchek*, the Texas Legislature passed an exclusionary statute prohibiting the introduction of evidence seized in violation of the Texas or federal constitution.

Johnson, to change its position in light of deci- sions handed down after original submission.

*Brown,* 657 S.W.2d at 804–05 (Clinton, J., concurring); *see* Act of March 9, 1925, 39th Leg., R.S., ch. 49, § 1, 1925 Tex.Gen Laws 186 (now Tex.Code Crim.Proc.Ann. art. 38.23 (Vernon Supp.1993)). The court of criminal appeals continued to follow *Welchek* after the exclusionary statute was passed but before it became effective. *Brown,* 657 S.W.2d at 805 n. 23 (Clinton, J., concurring).

■ After the exclusionary statute became effective in 1925, the court of criminal appeals determined cases based on both article one, section nine and the Fourth Amendment. We have found no case in which the court of criminal appeals held that a search or seizure was permissible under the Fourth Amendment but violative of article one, section nine. These cases show that the court of criminal appeals, in its interpretation of article one, section nine, not only did not grant defendants rights greater than those granted by the Fourth Amendment, but that it even resisted granting rights equal to those afforded a defendant in federal court.[5]

Texas courts did look beyond the state's boundaries for guidance in interpreting article one, section nine. As Judge Clinton noted, the early Texas high courts looked to the supreme courts of other states as well as to the United States Supreme Court.

Thus, when the Supreme Court of Texas imported a definition of probable cause from a sister state to apply in the malicious prosecution part of the cause being decided in *Landa v. Obert,* [45 Tex. 539 (1876)], that it had originated in a federal trial court did not mean the Supreme Court had "opted" to follow an expression of federal law, but only the Supreme Court

looked around and found elsewhere what it deemed to be a reasonably acceptable definition, having none of its own making at the time.

*Brown,* 657 S.W.2d at 801 (Clinton, J., concurring).

■ Judge Clinton's opinion illustrates the great caution employed by the early high courts in narrowly interpreting article one, section nine. We should follow that same caution. *Heitman* clearly gives us the authority to grant defendants greater rights under the Texas Constitution than afforded by the Supreme Court's interpretation of the United States Constitution. Because we *can* do so, however, does not mean that we *should* do so. State precedent existing before the Fourth Amendment was made applicable to the states does not support granting defendants greater rights under article one, section nine than they currently enjoy under the Fourth Amendment.

### 2. Textual Comparison

Textually, the Fourth Amendment is nearly identical to article one, section nine. The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Article one, section nine of the Texas Constitution states:

---

5. Some commentators argue that the statutory exclusionary rule shows the greater rights granted defendants under the Texas Constitution than the Fourth Amendment. *See* Arvel R. Ponton III, *Sources of Liberty in the Texas Bill of Rights,* 20 St. Mary's L.J. 93, 108 (1988). We disagree with this conclusion because the legislature passed the exclusionary rule in reaction to the court of criminal appeals' narrow interpretation of article one, section nine. *See also* Matthew W. Paul, Jeffrey L. Van Horn, *Heitman v. State: The Question Left Unanswered,* 23 St. Mary's L.J. 929, 962–66 (1992) (criticizing Ponton's research and analysis). If anything, the statutory exclusionary rule shows only the lengths to which the legislature has gone to broaden statutorily the narrow rights

read into article one, section nine by the court of criminal appeals. *See Brown,* 657 S.W.2d at 804 (Clinton, J., concurring). Furthermore, the Texas statutory exclusionary rule, unlike its federal counterpart, is not a rule of constitutional dimension. Article one, section nine provides no remedy for one whose constitutional rights have been violated thereunder. Tex. Const. art. I, § 9 interp. commentary (Vernon 1984); *see Imo v. State,* 816 S.W.2d 474, 479 (Tex.App.—Texarkana), *rev'd on other grounds,* 822 S.W.2d 635 (Tex.Crim.App.1991); Matthew W. Paul, Jeffrey L. Van Horn, *Heitman v. State: The Question Left Unanswered,* 23 St. Mary's L.J. 929, 959 n. 76 (1992).

The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

TEX. CONST. art. I, § 9.

Commentators on the Texas Constitution note the many differences in the wording of the state and federal constitutions on the subjects of freedom of speech, establishment and free exercise of religion, and right to confrontation of witnesses. Their remarks on article one, section nine, however, are limited to noting the arguably greater requirement of particular descriptions in warrants ("describing them as near as may be") and the fact that the Texas provision is worded positively ("The people shall be secure") while the federal provision is worded negatively ("The right of the people to be secure ... shall not be violated."). *See* Arvel R. Ponton III, *Sources of Liberty in the Texas Bill of Rights*, 20 ST. MARY'S L.J. 93, 107–08 (1988); James C. Harrington, *The Texas Bill of Rights and Civil Liberties*, 17 TEX.TECH. L.REV. 1487, 1538–39 (1986).[6] Ponton states that "Texans [did] desire greater protection of their rights against unreasonable search and seizure than the federal minimums," but he cites no authority for this statement of supposed original intent other than a comparison of the two constitutional provisions. *See* Ponton, *supra* at 108 n. 112. We disagree that the language of article one, section nine itself shows an intent to provide a defendant greater protection under the state constitution than that provided under the Fourth Amendment. *See* TEX. CONST. art. I, § 9 interp. commentary (Vernon 1984) ("[T]he language of Article I, Section 9 of the Texas Constitution is substantially the same as that used in [the Fourth] [A]mendment.").

### 3. Placement of the Bill of Rights

Although the Texas Bill of Rights appears at the front of our state constitution instead of being amended into it, we do not believe that this fact shows an intent on the part of the drafters of the 1876 constitution to grant greater rights to Texans than they enjoyed under the federal constitution. To so hold would be to imply that amendments to the United States Constitution are less important than its original text, a situation that would unnecessarily complicate constitutional interpretation and could result in absurd conclusions. Such an interpretation would render those rights amended into article one of the Texas Constitution, such as the rights of crime victims and the right to equality under the law,[7] inferior to the rights contained in the original Bill of Rights in 1876, such as the prohibitions against outlawry or transportation for offenses and against quartering of soldiers during peace time. *See* TEX. CONST. art. I, §§ 20, 25. Once an amendment is passed and becomes part of a constitution, it should be as effective as any other part of the constitution, regardless of its placement within the constitution or its date of passage.

The *Heitman* opinion suggests that the framers of the federal constitution did not consider the liberties contained in the Bill of Rights to be important because those rights were not placed at the front of the Constitution as in the Texas Constitution; however, the opposite appears to be the case. Alexander Hamilton explained that a bill of rights was not necessary because the Constitution was a grant of limited power to the government by the people. *See* THE FEDERALIST No. 84 (Alexander Hamilton). Therefore, the Constitution only needed to reserve rights to the people on subjects to which power was granted to the government. Hamilton specifically rejected the necessity of a constitutional provision protecting the freedom of the press because the Constitu-

---

6. In a more recent article, Harrington described article one, section nine and the Fourth Amendment as "phrased alike." James C. Harrington, *Framing a Texas Bill of Rights Argument*, 24 ST. MARY'S L.J. 399, 421 n. 125 (1993) (also describing *Heitman* as "a well-reasoned and comprehensive opinion").

7. The rights of crime victims, TEX. CONST. art. I, § 30, was adopted November 7, 1989, and the right to equality under the law, also known as the equal rights amendment, TEX. CONST. art. I, § 3a, was adopted November 7, 1972.

tion did not grant power to the government to regulate the press. *Id.* Hamilton worried that an expansive bill of rights might be interpreted as an all-inclusive statement of the rights of the people, thereby permitting the government to assume all power except those expressly prohibited when the framers intended the government to have no powers except those expressly contained in the Constitution. *Id.* Therefore, far from having been an oversight by the framers, the absence of a bill of rights from the original text of the Constitution was intended by the framers for the better protection of the rights of the people. The people, however, disagreed with the framers and insisted that their freedom would be better protected with a bill of rights than without one. *See* Matthew W. Paul, Jeffrey L. Van Horn, *Heitman v. State: The Question Left Unanswered,* 23 St. Mary's L.J. 929, 939 n. 40 (1992). In order to insure ratification of the Constitution, it was agreed that the first duty of the Congress would be to pass the Bill of Rights. *Id.* The argument that the framers of the federal constitution were less concerned with the people's rights than the framers of the state constitution is not supported by the historical record. *See id.* at 939. Thus, the placement of the Bill of Rights in the Texas Constitution should not warrant granting defendants greater rights under the Texas Constitution than under the United States Constitution.

### 4. Looking to the Supreme Court for Guidance

■ Considering the vague suggestions in *Heitman* and the clearer statements in Judge Clinton's concurring opinion in *Brown,* we will look to the Supreme Court's and other federal courts' interpretations of the similar provisions in the Fourth Amendment,

not as a *source* of the law, but only for *guidance* in interpreting article one, section nine. If the Supreme Court's interpretation conflicts with the public policy of Texas or its historical constitutional interpretation, then we will reject that interpretation (insofar as we do not tread on the rights of the defendant) in favor of an interpretation more consistent with our local needs and traditions. *Cf. Gords v. State,* 824 S.W.2d 785, 787–88 (Tex.App.—Dallas 1992, pet. ref'd) (traditionally greater rights under article one, section nine than Fourth Amendment to determine reasonableness of impoundment of vehicle leading to inventory search). However, it is the appellant's burden to show why the Fourth Amendment conflicts with article one, section nine. *See Heitman,* 815 S.W.2d at 690 n. 23 ("Attorneys, when briefing constitutional questions, should carefully separate federal and state issues into separate grounds and provide *substantive analysis or argument* on each separate ground." (Emphasis added.)). If the conclusion reached under the Fourth Amendment does not conflict with Texas public policy and the historical constitutional analysis of article one, section nine, we will consider ourselves free, but not bound, to adopt the conclusion of the Supreme Court under our own constitution for search and seizure issues.[8]

### C. *Hodari* Under the Texas Constitution

■ In this case, we are faced with the issue of whether to follow the Supreme Court's definition of "seizure" when the person does not yield to a police show of authority. Like the early Texas Supreme Court trying to define "probable cause," we have no state authority to aid us in determining whether a defendant is "seized" when fleeing from the police.[9] Our looking to the United

---

8. This Court has already held that the test for determining whether an officer has reasonable, articulable suspicions justifying a stop or detention of an individual is the same under article one, section nine as under the Fourth Amendment. *See Owens v. State,* 861 S.W.2d 419, 421 (Tex.App.—Dallas 1993, no pet. h.); *Cook v. State,* 832 S.W.2d 62, 65 (Tex.App.—Dallas 1992, no pet.); *Brown v. State,* 830 S.W.2d 171, 174 (Tex.App.—Dallas 1992, pet. ref'd).

9. In *State v. Rose,* the Tyler Court of Appeals held that the rationale of *Hodari* is applicable under article one, section nine. *State v. Rose,* 844 S.W.2d 911, 912 (Tex.App.—Tyler 1992, no pet.). The Tyler court's reasoning was that the court of criminal appeals adopted *Hodari* under the Texas Constitution in the *Johnson* opinion vacating our judgment and remanding the cause to this Court. *Id.; see Johnson,* 825 S.W.2d at 126–27. We do not construe the court of criminal appeals' opinion as so holding. The court of criminal appeals does not mention either the Texas Constitution or

States Supreme Court's handling of this issue is no more an abdication of our duty to independently interpret the Texas Constitution than the early Texas Supreme Court's was in *Landa v. Obert* in looking beyond the boundaries of Texas for aid in interpreting the probable cause requirement of article one, section nine. *See Landa v. Obert*, 45 Tex. 539, 544 (1876). In making this determination, we will examine the rationale underlying the Supreme Court's decision in *Hodari* and determine whether its conclusion is consistent with Texas precedent and sound public policy.

### 1. The Path From *Terry* to *Hodari*

Under the United States Constitution, "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry*, 392 U.S. at 16, 88 S.Ct. at 1877. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877.[10] The "reasonable person" in this test is an innocent person; "the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position." *Bostick*, —— U.S. at ——, 111 S.Ct. at 2388 (quoting *Royer*, 460 U.S. at 519 n. 4, 103 S.Ct. at 1335 n. 4 (Blackmun, J., dissenting)). In all of these cases, the person claiming to have been seized complied or was physically

forced to comply with the police request to stop.

The Supreme Court applied the reasonable person test to a fleeing defendant in *Michigan v. Chesternut*. There, the Court noted that the reasonable person test "is designed to assess the coercive effect of police conduct." *Chesternut*, 486 U.S. at 573, 108 S.Ct. at 1978. Police conduct that does not stop or restrain the liberty of a defendant cannot reasonably be described as having a "coercive effect." The Court held that the officers' alleged show of authority, driving next to the suspect who was running on foot, did not, under those specific facts, constitute a coercive show of authority. *Id.* at 575, 108 S.Ct. at 1980. Thus, in *Chesternut*, it was not necessary for the Court to reach the issue of whether the defendant was seized even though he did not comply with the alleged show of authority because, as the Court held, there was no show of authority for him to comply with. *Id.* at 575 n. 9, 108 S.Ct. at 1980 n. 9.

■ These cases demonstrate that the reasonable person test determines whether the officer's show of authority is so coercive that a person's compliance would be deemed involuntary. The test does not purport to hold that the show of authority necessarily results in a seizure. Such a holding was unnecessary because, prior to *Hodari*, the suspects in the cases complied with the show of authority.

■ In *Hodari*, the Court finally addressed the question of whether an uncomplied-with show of authority resulted in a seizure, and the Court held that it did not. In *Hodari*, the Court applied a two-prong test to determine whether a suspect was seized. First, the court must determine

---

Texas statutes in the opinion. *See Johnson*, 825 S.W.2d at 126–27. Indeed, the state constitutional issue was not raised until rebriefing after remand. Accordingly, we do not adopt the reasoning of the Tyler court in reaching the same conclusion.

10. The Court stated:
Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave *if he had not responded*, one cannot say that the questioning resulted in a

detention under the Fourth Amendment. But if the persons refuses [sic] to answer and the police take additional steps ... to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate *the detention or seizure*.

*Delgado*, 466 U.S. at 216–17, 104 S.Ct. at 1763 (emphasis added). The emphasized portions show that the test was intended to apply to police conduct that resulted in compliance by and detention of the suspect.

whether, applying the reasonable person test, the police conduct constituted a *Mendenhall* show of authority, *i.e.,* conduct such that, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 544, 100 S.Ct. at 1877. If the officer's conduct constitutes a *Mendenhall* show of authority, the court must next determine whether this conduct had an actual coercive physical effect on the suspect, *i.e.,* did the suspect comply with the officer's command. If so, then the person was seized. In *Chesternut,* the first prong was not met, so it was not necessary for the Court to consider the second prong. In *Hodari,* the Court assumed that the first prong was met, but it found that the second prong was not met.

*Hodari* did not change the preexisting rule for determining seizure; the Court had always assumed the second prong because the suspects had all complied or been forced to comply. Contrary to some commentators on the law, we read *Hodari* as consistent with preexisting federal constitutional rules determining seizure. *But see* 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE, A TREATISE ON THE FOURTH AMENDMENT § 9.2A(d) (2d ed. Supp.1993) (hereinafter LAFAVE).

The Supreme Court's interpretation in *Hodari* of seizure under the Fourth Amendment in the context of a fleeing defendant is a logical one. That a defendant running pell-mell from an officer could be described at that moment as "seized" is a concept at odds with common, or even sensible, use of the English language as well as the precedents both of the Supreme Court and the court of criminal appeals.[11] *Hodari* adequately protects a fleeing suspect's rights. If he stops when ordered to do so and cooperates with the police, he can then challenge the voluntariness of that compliance under the reasonable person test. If his compliance was coerced, he can challenge the existence of reasonable, articulable suspicions to justify his detention.

### 2. Applicability of *Hodari* Under Article One, Section Nine

■ If the fleeing suspect stops as a result of the officer's show of authority or if he is physically forced to stop, then he will be "seized" under article one, section nine. As long as he chooses to ignore the officer's show of authority, he will not be permitted to claim that the show of authority interfered with his liberty. To rule otherwise would encourage suspects to flee from the police, a practice that endangers the fleeing suspect, the pursuing officer, and the general public. *See, e.g., Chambers v. City of Lancaster,* 843 S.W.2d 143, 146 (Tex.App.—Dallas 1992, writ granted) (driver of motorcycle killed while fleeing from police); *Travis v. City of Mesquite,* 764 S.W.2d 576, 579 (Tex.App.—Dallas 1989) (Thomas, J., dissenting) ("More than 500 Americans die and over 1,000 sustain major injuries each year as a result of rapid police pursuit of lawbreakers...."), *rev'd,* 830 S.W.2d 94 (Tex.1992).

■ The Texas Legislature has made clear its support of the public policy of encouraging suspects to yield to a police show of authority. Section 38.04 of the penal code makes it an offense to flee from an officer attempting to arrest or detain him. TEX.PENAL CODE ANN. § 38.04(a) (Vernon Supp. 1993).[12] Like the prohibition against evading arrest, the intent of the prohibition against evading a detention is "to deter flight from [detention] by the threat of an additional penalty, thus discouraging forceful conflicts

---

11. Query: what if the defendant should succeed in his flight and escape? When would this "seizure" end—when he is finally captured, hours, days, or perhaps years later?

12. Prior to 1989, the statute only prohibited flight from an attempted arrest. In 1987, the court of criminal appeals held that a suspect fleeing from an attempted detention did not violate the statute. *Smith v. State,* 739 S.W.2d 848, 850 (Tex.Crim.App.1987). At the next regular legislative session, the Texas Legislature amend-

ed section 38.04 to prohibit flight from an officer attempting to detain a person for questioning or investigating possible criminal activity. *See* Act of May 3, 1989, 71st Leg., R.S., ch. 126, § 1, 1989 Tex.Gen.Laws 488. The amendment did not take effect until September 1, 1989 and only applied to offenses committed after the effective date. *See id.* § 2. Because Johnson's flight from an attempted detention occurred prior to September 1, 1989, section 38.04 did not provide the police with probable cause to arrest him.

between the police and suspects." *Alejos v. State*, 555 S.W.2d 444, 449 (Tex.Crim.App. 1977) (op. on reh'g). Although the section contains an exception for unlawful arrests or detentions, the section supports a policy of yielding to a police show of authority, whether or not lawful, and challenging the lawfulness of the seizure in court. *See id.* § 38.-04(b). The prosecuting attorney has the burden of proving beyond a reasonable doubt that the police had reasonable suspicion to investigate. *See* Tex.Penal Code Ann. § 2.02 (Vernon 1974).

Holding that a suspect who has not stopped is not seized under article one, section nine will not encourage police misconduct. Currently, if a suspect flees from a police officer he knows is trying to detain him, the officer arguably [13] will have probable cause to arrest the suspect for violating section 38.04(a) of the penal code. Because section 38.04(a) arguably authorizes the police to arrest a suspect fleeing an attempted detention, we fail to see how holding that a defendant is not seized until he stops or is stopped would further encourage police misconduct.

Requiring that a suspect yield to a show of authority or be physically stopped by the police before being deemed "seized" under article one, section nine serves the public interest by encouraging compliance with police orders without sacrificing the suspect's constitutional rights to challenge the lawfulness of those orders and invoke the statutory exclusionary remedy. Prior to the effective date of the exclusionary statute, a suspect's only remedy for avoiding the effects of unconstitutional police conduct was self-help, *i.e.*, flight. *See Welchek*, 247 S.W. at 529 (Texas would not interpret article one, section nine to contain an exclusionary rule). Even Professor LaFave acknowledges that "there are ... certain types of self-help ...

which cannot be tolerated as a means of preventing Fourth Amendment violations...." LaFave § 9.2A(d) at Supp. 108.[14] With the amendment of section 38.04 prohibiting flight from a detention, the legislature has declared flight from an attempted detention to be one of those intolerable means of self-help. With the passage of the exclusionary statute, however, the legislature provided a legal remedy for a suspect whose statutory or constitutional rights had been violated. *See* Tex.Code Crim.Proc.Ann. art. 38.23 (Vernon Supp.1993). No longer need the illegally detained suspect rely on the self-help remedy of flight to protect his right to be free of unreasonable search and seizure. Today, a defendant's remedy for unlawful police conduct is the exclusionary statute, not flight.

Accordingly, in determining when one is "seized" under article one, section nine, we adopt the conclusion reached by the Supreme Court in *Hodari*. That result is consistent with Texas public policy and with Texas cases' interpretation of *Terry* stops and investigatory detentions.

### D. Application of the Law

 The officers' chasing Johnson and shouting at him to stop constituted a show of authority that would lead a reasonable innocent person to believe that he was not free to leave. Thus, the first prong of the test for seizure was met. If Johnson had complied with the police order to stop, he undoubtedly could claim to have been seized. However, Johnson did not at that moment comply with the order to stop but continued to run from the police. Because Johnson did not stop, the officers' show of authority did not have a coercive effect on Johnson. Thus, the second prong of the test for seizure was not met. Accordingly, we hold that the officers' pursuit of Johnson and orders to him to stop did

**13.** The issue of the extent of probable cause necessary to arrest a suspect fleeing an attempted detention is, of course, not before us in this case. Therefore, we make no holding on this issue here.

**14.** One of the forms of self-help that Professor LaFave stated was intolerable was a suspect's use of physical force against an officer making an illegal arrest. LaFave § 9.2A(d) at Supp. 108.

That form of self-help is clearly intolerable under Texas public policy. *See* Tex.Penal Code Ann. § 38.03(a), (b) (Vernon 1989 & Supp.1993). Professor LaFave does not believe that mere flight from a police officer is an intolerable form of self-help, unless the means of flight actually places others in danger. LaFave § 9.2A(d) at Supp. 108.

not constitute a seizure of Johnson under article one, section nine.

## Complied-with Show of Authority

 Finally, we must consider whether Johnson was seized when he complied with the officers' orders, with guns drawn, for him to drop his gun and to stop. Clearly, a reasonable innocent person would not feel free to leave when two police officers with guns drawn order him to stop. Thus, the first prong was met. When Johnson complied with the officers' orders and stopped, the second prong of the test for seizure was met and he was, at that moment, seized under both the Fourth Amendment and article one, section nine.

Whether Johnson was seized a few moments earlier when, still running, he complied with the officers' order to drop the gun[15] is a more difficult issue. However, the decision of whether he was seized at the moment he dropped the gun is not critical to our analysis; for the purposes of this opinion we will assume, without deciding, that Johnson's compliance with the order to drop the gun met the second prong of the test for seizure. Accordingly, Johnson was seized when he dropped the gun and, simultaneously, the Crown Royal bag containing the drugs.

 Because the officers saw the gun before Johnson complied with their orders to drop it, and therefore before he was seized, they had probable cause to arrest him for unlawfully carrying a weapon at the time that they seized him. See TEX.PENAL CODE ANN. § 46.02(a) (Vernon 1989); TEX.CODE CRIM.PROC.ANN. art. 14.01(b) (Vernon 1977). Accordingly, Johnson was lawfully seized and arrested by the officers.

## Seizure and Search of the Crown Royal Bag

 Once the police have lawfully arrested a person, they may conduct a warrantless search of the person and of objects immediately associated with him. *Jones v. State,* 640 S.W.2d 918, 921 (Tex.Crim.App. [Panel Op.] 1982). Clearly, the Crown Royal bag was an object immediately associated with Johnson's person. The officers' search of the Crown Royal bag constituted a lawful warrantless search incident to a lawful arrest. *See Jones,* 640 S.W.2d at 921 (search of briefcase held by defendant when arrested); *Longoria v. State,* 763 S.W.2d 597, 599 (Tex. App.—Corpus Christi 1988, no pet.) (search of box carried by defendant when arrested); *Caro v. State,* 761 S.W.2d 488, 490 (Tex. App.—Dallas 1988, pet. ref'd) (lawful for police to search contents of closed containers in vehicle driven by defendant when arrested). Additionally, article one, section nine permits the police to conduct a warrantless search of a person they have probable cause to believe is about to draw a weapon on the officer. *See* TEX. CONST. art. I, § 9 interp. commentary (Vernon 1984); *Hobrecht v. State,* 127 Tex.Crim. 294, 75 S.W.2d 1099, 1099 (1934).

We hold that the trial court properly denied Johnson's motion to suppress. We overrule Johnson's point of error on remand.

## EXCESSIVE PUNISHMENT

On the first appeal of this case, Johnson contended in his second point of error that his sentence of fifty years' imprisonment is excessive. Because we reversed his conviction in the first appeal, we did not reach this point. We now address the point.

 Johnson argues that his fifty-year sentence violates the Eighth Amendment's prohibition against cruel and unusual

---

15. The testimony about Johnson's manner and intent in divesting himself of the gun and the bag is somewhat conflicting. Bailey described the gun and the bag as becoming "dislodged or dropped." He also said, "When I told him for the very last time to drop the weapon, it all went to the ground ... the bag and the weapon." Lewis testified, "I ... was yelling at him to 'Stop. Stop. Drop the gun,' and at that point in time the gun and the bag was [sic] dropped."

During questioning by the prosecutor, Lewis was asked, "Q. ... [T]he defendant continued on and eventually *threw down* the Crown Royal bag and the gun; is that right? A. That's correct." (Emphasis added.) Lewis also stated, "And after about the second yell of my partner [to drop the gun], he complied with my partner." We read the facts as showing that Johnson intentionally dropped the gun and the bag in response to the officers' commands to him to do so.

punishment.[16] His sentence was well below the maximum punishment of life imprisonment. Punishment assessed within the range of punishment authorized by statute is not cruel or unusual and does not render the sentences excessive. *Carpenter v. State*, 783 S.W.2d 232, 232–33 (Tex.App.—Dallas 1989, no pet.).

 Johnson also appears to contend that the Texas sentencing scheme is unconstitutional as applied to him because his punishment is disproportionate to his offense. Prison sentences are subject to a proportionality analysis under the Eighth Amendment. The punishment must be proportionate to the crime. *Solem v. Helm*, 463 U.S. 277, 289–90, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637 (1983). In *Solem*, the Supreme Court set out three factors the reviewing court should consider when determining whether the sentence is cruel and unusual: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the punishment for the same crime in other jurisdictions. *Solem*, 463 U.S. at 292, 103 S.Ct. at 3011. Because of the substantial deference reviewing courts accord the legislatures and trial courts, appellate review rarely requires extended analysis to determine the constitutionality of the sentence. *Solem*, 463 U.S. at 289–90 & n. 16, 103 S.Ct. at 3009–10 & n. 16.

Johnson argues only the first of the three factors, the gravity of the offense and the harshness of the penalty. Johnson notes that he had no prior convictions, felony or misdemeanor, and that the State introduced *no evidence indicating that he had a bad reputation for being peaceful and law abiding.* Johnson also asserts that the trial court misconstrued the facts of the case by noting that it was a very serious offense when "the defendant has a gun and tries to use it on an officer." Johnson contends that this statement is incorrect because the record shows that he only fumbled with the gun and then dropped it either intentionally or because it became dislodged. These facts, according to Johnson, show that the sentence was disproportionate to the crime.

The crime in this case was aggravated possession of cocaine with intent to deliver. The purple bag Johnson dropped contained 162 separately wrapped ten-dollar rocks of crack cocaine. This evidence supports an inference that Johnson was selling cocaine to the end users of the drugs. The court was entitled to consider the damage caused to society by drug dealers like Johnson. The fact that he had no prior convictions supports the trial court's decision to sentence him midway in the range of punishment.

The record supports the trial court's interpretation of the testimony about Johnson's gun. Although Johnson dropped the gun while fumbling with it, it is a reasonable deduction from the evidence that Johnson began fumbling with the gun after pulling it to shoot Lewis or Bailey. We hold that Johnson's sentence of fifty years is not excessive and does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. We overrule Johnson's second point of error and affirm the trial court's judgment.

McGARRY, C.J., and BAKER, THOMAS, KINKEADE, OVARD, BURNETT, MALONEY, CHAPMAN, ROSENBERG, BARBER, MORRIS and WHITTINGTON, JJ., join in this opinion.

---

**16.** Johnson does not contend that his sentence violates any portion of the Texas Constitution.