

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00008-CR

———————————————

KENDELL JERRELL MORRIS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1642293

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Kendell Jerrell Morris appeals his conviction for murder and sentence of 27 years' imprisonment. In two points, he complains that the trial court reversibly erred by denying his motion for a continuance and his motion to suppress. Because both of these points lack merit, we will affirm.

## I. BACKGROUND

Morris does not challenge the sufficiency of the evidence to support his conviction, nor does he allege any error that occurred at the punishment phase of his trial. We will therefore briefly summarize the facts of the murder as proved up at the trial on the merits and incorporate further details into our analysis of his two points.

Morris was in a relationship with LaBrittany Moore from 2016 to 2018. They had a daughter together, but in December 2018, LaBrittany decided to break off her relationship with Morris. About a year after breaking up with Morris, LaBrittany started a new relationship with Tyron Mitts. Morris was very unhappy about this, according to LaBrittany, and began sending her insulting and threatening text messages. One such text message read, "I LOVE YOU still, but ima [sic] catch a case . . . period," which LaBrittany interpreted as Morris's saying that he was going to commit a criminal offense. He also messaged Mitts on Facebook[1] and even texted LaBrittany a picture of Mitts.

---

[1]One of the Facebook messages Morris sent to Mitts read, "Play pussy if you want nigga just don't let me catch u lakkin," which one witness at Morris's trial testified "can mean basically don't let me catch you without a weapon."

2

On the morning of May 4, 2020, Morris came to LaBrittany's apartment in Arlington, Texas. LaBrittany was home at the time with their daughter. Mitts and his daughter were also in the apartment. LaBrittany went to the door, and Morris told her to tell her "boyfriend" to come outside. She told him that he needed to leave or she would call the police, but he "just kept repeating himself about 'tell your boyfriend to come outside.'"[2] She walked him downstairs to the car,[3] as they kept repeating their directives to each other. He got in the car and gave LaBrittany a stern look before driving off. LaBrittany observed Morris's best friend, David Jones, sitting in the front passenger seat "bent over . . . and . . . doing something" on the floor.

Once Morris drove away, LaBrittany went back into her apartment to briefly speak to Mitts, and then they both went back out "to look over the little balcony [on the breezeway outside their apartment] to assess what [had] just happened." After observing that the car in which Morris had driven away was gone, Mitts went back inside to check on the children. LaBrittany remained outside and observed her neighbor Robert Cooley walking by the garages. She then began walking to her apartment's front door, but before she even made it inside, she heard shots ring out.

---

[2]LaBrittany testified at trial that Morris was "[a]ggressive, angry, [and] stern."

[3]LaBrittany testified that she recognized the car and that it belonged to Morris's friend, whom she knew only as "J." Other testimony at trial indicated that the car was registered to a family member of Justin Phillips, who identified himself as being Morris's friend.

LaBrittany ran back outside and "saw Mr. Cooley's legs laying out from the other side of a car." She started screaming and running towards him.

LaBrittany called 9-1-1. She described the car that she had seen Morris driving that morning as a white Nissan Altima with the "bumper falling off." Police arrived at the apartment complex within minutes and, upon seeing Cooley's body, could immediately tell that he was dead. Cooley had suffered multiple gunshot wounds, and there were shell casings and what appeared to be pieces of brain matter scattered around his body. Upon inspecting the shell casings, one of the officers thought that Cooley had been shot with "an AR-style weapon."

LaBrittany suggested that Morris had shot Cooley, mistaking him for Mitts. She said that both men were young and slender and had a similar "[b]uild and hairstyle and similar skin tones." She also told police that Morris did not know what her new boyfriend looked like, "only that he had dreadlocks and was darker skinned."

The police gathered information from other witnesses at the crime scene and put out a "be on the lookout," or BOLO, for Morris and the Altima. Morris and Jones were apprehended later that day in Madisonville, Texas. Morris was driving a white Nissan Altima with damage to the rear bumper, and Jones was his only passenger. Inside the car, an investigator with the Madison County Sheriff's Office (MCSO) located an AR15 rifle as well as a black bag containing magazines and unspent ammunition. DNA testing matched material collected from the Altima's

4

front bumper and the hub cap of its left front wheel to Cooley's DNA profile. In June 2020, Morris was charged with Cooley's murder.

## II. ANALYSIS

Morris raises two points on appeal. In his first point, he argues that the trial court erred when it denied the Motion for Continuance that he filed on the eve of trial[4] based on what he alleged was a violation of Article 39.14 of the Texas Code of Criminal Procedure. In his second point, he argues that the trial court erred when it denied his Motion to Suppress what he calls "the fruits of an illegal traffic stop."

### A. Motion for Continuance

**1. Standard of Review and Applicable Law**

We review a trial court's decision to grant or deny a continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007); *see* Tex. Code Crim. Proc. Ann. arts. 29.03 (stating that a criminal action may be continued upon sufficient cause shown). To establish reversible error based on the denial of a motion for continuance, a defendant must show both that the trial court erred in denying the motion and that the lack of a continuance harmed him. *Gonzales v. State*, 304 S.W.3d 838, 842–43 (Tex. Crim. App. 2010) (explaining that the defendant "should allege facts tending to establish both prongs—error and harm").

---

[4]Morris filed his Motion for Continuance on a Friday. His trial began with jury selection the following Monday.

5

The error prong "requires a showing that the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial." *Id.* at 843 (quoting 42 George E. Dix & Robert O. Dawson, *Texas Practice Series: Criminal Practice and Procedure* § 28:56 (2d ed. 2001), at 532–33). The harm prong requires a defendant to show with specificity that the trial court's ruling resulted in actual prejudice to his defense. *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996); *Heiselbetz v. State*, 906 S.W.2d 500, 511–12 (Tex. Crim. App. 1995).

Because speculative harm is not enough, *see Renteria v. State*, 206 S.W.3d 689, 702 (Tex. Crim. App. 2006), a defendant who was denied more time to prepare must demonstrate "with considerable specificity how [he] was harmed by the absence of more preparation time than he actually had," a showing that should ideally occur at a hearing on a new-trial motion. *Gonzales*, 304 S.W.3d at 842–43 (quoting Dix & Dawson, *supra*, who explained that a showing of harm "can ordinarily be made only at a hearing on a motion for new trial, because almost always only at that time will the defendant be able to produce evidence as to what additional information, evidence[,] or witnesses the defense would have had available if the motion for delay had been granted"); *see also Rodriguez v. State*, No. 02-23-00224-CR, 2024 WL 1451974, at *2–3 (Tex. App.—Fort Worth Apr. 4, 2024, no pet.) (mem. op., not designated for publication) (noting that specific harm can ordinarily be shown only at a hearing on a new-trial motion and that although appellant filed a motion for new trial, his sole

argument was that "the verdict [was] contrary to the law and evidence"). A motion for new trial is not, however, necessary to preserve error concerning the denial of a continuance motion. *Harrison v. State*, 187 S.W.3d 429, 433 (Tex. Crim. App. 2005).

## 2. Applicable Facts

The week before Morris's trial began in December 2023, his defense team learned from a defense attorney who was trying another case in Tarrant County at the time that one of the State's witnesses, Detective Richard Jablon of the Arlington Police Department, had not been turning over the "raw data" extracted from cell phones that he had been tasked with forensically examining. On December 8, 2023, Morris's trial attorneys filed a sworn Motion for Continuance "pursuant to Article 39.14 of the Texas Code of Criminal Procedure." *See* Tex. Code Crim. Proc. Ann. art. 39.14 (governing discovery in criminal cases). That same day, the lead prosecutor on Morris's case, Lisa Callaghan, contacted Detective Jablon and arranged a phone conversation between him and Morris's trial attorneys. Although the parties later disagreed on what exactly was said in that phone conversation,[5] Detective Jablon

---

[5]The record indicates that Detective Julia Hall of the Arlington Police Department had collected four cell phones in this case: one from Cooley, one from Morris, one from Jones, and one from LaBrittany. The record also indicates that Detective Hall gave at least one phone—Cooley's—to Detective Jablon for a data extraction. Oliver Hassibi, Morris's second-chair attorney at trial, told the trial court at the hearing on the defense's Motion for Continuance, "[W]e requested four cell phones from Detective Jablon on Friday[, December 8, 2023, and] while we were on the telephone. . . . I said, [']You have four cell phones, Detective Jablon, correct?['] He said, [']Yes.['] I need the underlying digital information for all four. He said, [']Yes, fine.[']" But Detective Jablon testified at that same hearing, "I don't know how many

7

cell phones there were. I knew of two." Hassibi then called Callaghan to the witness stand, and the following exchange occurred:

Q. Did you at the time that we were in that room back there understand that we were looking for all cell phones or just two cell phones, ma'am?

A. Just what Detective Jablon was --

Q. I'm asking you, ma'am.

A. I'm answering the question. My understanding was that you were wanting what Detective Jablon had done. Your entire conversation, you and [Morris's court-appointed trial attorney, George Mackey,] both with me, was about Detective Jablon.

. . . .

Q. Is it your testimony that you felt we only cared about the two cell phones that Detective Jablon had?

A. Yeah.

The next day, the roles were reversed, with Hassibi taking the witness stand in support of the defense's renewed Motion for Continuance and Callaghan questioning him:

Q. (BY MS. CALLAGHAN) I went in the bailiff's office and, because I was confused about what you were asking for, I got Jablon on the phone for you so that you could directly ask him for what you wanted.

A. Which was four cell phones. I asked him for four cell[] phones while you were sitting there, yes, ma'am.

Q. Okay. And you understand that there is a conflict between what I recall and what you recall on that point?

A. Apparently.

Q. I don't recall you ever saying anything about four cell phones; just that you wanted whatever Jablon had.

8

admitted that he had not provided the defense or the prosecutors with the raw data from cell phones on which he had performed extractions in Morris's case.

The trial court heard Morris's Motion for Continuance on December 11, 2023.[6] At the hearing, Detective Jablon testified that he used computer software—specifically, Cellebrite[7]—to extract data from two cell phones in Morris's

---

A. I disagree with you. That may be your recollection, but it's not mine.

Q. Was there a period of time where you were in there talking to him and I was not?

A. No, ma'am.

Q. Are you sure?

A. I take that back. There is -- there was a short period.

Q. Okay. Well, that being the case, the entire conversation related to Jablon and Jablon's cell phones?

A. Although I asked him if there were four cell phones in this case and he confirmed that there were and I said, ["]I need the underlying data for all four telephones.["] Whether you were there or not with regard to that statement that I made, I can't speak to that, I don't remember, but I can tell you exactly what I told Detective Jablon, which is what I just said, "Are there four cell phones?" He answered in the affirmative. I said, "I need the underlying data for all four cell phones," and he said okay.

[6]Also on December 11, 2023, Morris's trial attorneys filed a motion to have their expert "independently test the subject cell phones for all data contained therein."

[7]Cellebrite is a forensic program used to extract and read data from digital devices, including text messages, call logs, and images. *See Wright v. State*, 618 S.W.3d 887, 890 (Tex. App.—Fort Worth 2021, no pet.).

case.[8] He testified that Cellebrite's software is updated "[p]eriodically" to improve the data extraction process, that his last data extraction from the two phones in his possession was over three years prior to trial, and that he had not conducted another extraction of the phones with any of the updated software. He conceded that "if I did a different extraction, it could possibly extract more data," but he also confirmed that he was "not guaranteed to get anything different" and that it was possible that with a new rendition of Cellebrite he might even get less data.[9]

Detective Jablon explained that there are different types of data extractions.

Q. Advanced logical extraction?

A. That is one of them.

Q. Did you do that in this case?

A. In this case, yes, sir.

Q. And that's a bare minimum of data; is that correct?

A. It was the data I could acquire at the time.

Q. And a file system extraction, is that correct?

A. A file system extraction is one extraction.

---

[8]Although the record is clear that one of the cell phones from which Detective Jablon extracted data had belonged to Cooley, it is unclear to whom the other cell phone belonged. From the context of the record, it appears that the other cell phone was LaBrittany's.

[9]When asked about the quantity of information that he did not supply, Detective Jablon testified, "The extraction I did were several gigabytes," and that he had "no idea" how many pages of documents that would be, but the number would be voluminous.

Q. Did you do that in this case?

A. It was not available to me.

. . . .

Q. What about a full file system extraction? Is that even more in-depth data collection?

A. That would be the most data we would be able to obtain.

Q. Did you do that in this case?

A. I was not able to do one.

Q. And why is that?

A. Limitations of the software.

Q. So those first three that I mentioned, advanced logical extraction, file system extraction and full file system extraction, are only -- they are not a full physical extraction of data from a cell phone; is that correct?

A. Correct.

Q. Did you do a physical extraction in this case?

A. The only extraction I was able to get in this case was an advanced logical.

Q. And that is the minimum information of any extraction; is that correct?

A. In this case, it was the most I could get. An advanced logical is more than a logical, so it's by nature more than a logical extraction.

Q. A physical extraction extracts all the data from a cell phone; is that correct?

A. Yes, sir.

Q. You did not do that, did you?

11

A. No, I did not.

Detective Jablon explained that the raw data extracted from a cell phone is not understandable by a human being; "[i]t has to be interpreted" by the software. He testified that the raw data that he had obtained and preserved back in 2020 would not change if he ran it through the program again, but the ability to look at and perceive it would change.

A copy of a police report by Detective Jablon was admitted for the purpose of the hearing. The report mentioned only one phone. As pertinent here, Detective Jablon stated in the report,

> Det[ective] Hall stated she was interested in obtaining what data could be extracted from the device. No specific data was requested.

> Other than a brief examination of the resident data for verification purposes, no extensive exam was performed. The data extracted from the device was provided to Det[ective] Hall for further analysis, with assistance provided if needed.

> A Physical Cellebrite report was generated for this case using the license Physical Analyzer (v. 7.33.0.30) and provided to Det[ective] Hall. A copy of the report and extracted data will be maintained on the ECU Servers.

In his closing argument to the trial court at the hearing, Mackey urged that the defense needed the requested continuance to do "a full physical extraction of data containing probably, we can only guess at this point, exculpatory evidence." The trial court denied the Motion for Continuance.

The next morning, the defense renewed its Motion for Continuance to give the trial court "an update as to the information that [the defense] still ha[d]n't gotten."

12

Hassibi testified that there were two phones in the possession of the Fort Worth Police Department and that he had asked the prosecutors "to have the Fort Worth detective" put the data for the two cell phones on a thumb drive that he would provide. Hassibi further testified that there were "two cell phones that [the defense] still d[id]n't have the underlying data for and . . . some 70 -- 66 to 70 gigabytes of information on those two cell phones." The trial court denied the defense's renewed motion.

**3. Discussion**

Morris argues that the trial court abused its discretion and that he "suffered actual harm from the trial court's denial of his . . . Motion for Continuance." The State counters that it complied with its obligations under Article 39.14, that the trial court did not err in denying Morris's requested continuance, and that no actual harm resulted from the denial of a continuance. We agree with the State.

It is not clear from Morris's appellate brief exactly which provision of Article 39.14 he claims the State violated. Subsection (a) of the statute provides:

> Subject to the restrictions provided by Section 264.408, Family Code, and Article 39.15 of this code, as soon as practicable after receiving a timely request from the defendant the [S]tate shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the [S]tate in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain

13

evidence material to any matter involved in the action and that are in the possession, custody, or control of the [S]tate or any person under contract with the [S]tate. The [S]tate may provide to the defendant electronic duplicates of any documents or other information described by this article. The rights granted to the defendant under this article do not extend to written communications between the [S]tate and an agent, representative, or employee of the [S]tate. This article does not authorize the removal of the documents, items, or information from the possession of the [S]tate, and any inspection shall be in the presence of a representative of the [S]tate.

Tex. Code Crim. Proc. Ann. art. 39.14(a). Subsection (h) requires the State to "disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the [S]tate that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged," *id.* art. 39.14(h), and subsection (i) imposes a duty on the State to "electronically record or otherwise document any document, item, or other information provided to the defendant under this article," *id.* art. 39.14(i).

In his brief, Morris makes generalized statements intimating that Article 39.14 was not "fully recognized" or "fully observed" in this case and that the State did not provide "the evidence required by Article 39.14." But he does not identify a specific violation of Article 39.14 by the State, and we see no apparent violation from the record before us. His Motion for Continuance likewise did not identify any specific violation of Article 39.14; it listed certain discovery requests that his defense had made and then stated, "The information cannot be procured by any other source known to [Morris] and that [Morris] has reasonable expectation of procuring the same at the

next term of the Court." Neither Morris nor his attorneys claimed—much less established—that they were unaware that the State (or, more specifically, the police) had possession, custody, or control of the four cell phones at issue or that he and his attorneys were prevented from inspecting the phones and conducting (or having an independent expert conduct) their own data extraction.[10]

---

[10] By its plain language, Article 39.14 "does not authorize the removal of the documents, items, or information from the possession of the [S]tate, and any inspection shall be in the presence of a representative of the [S]tate." Tex. Code Crim. Proc. Ann. art. 39.14(a). Detective Jablon explained how the process works at the first hearing on Morris's motion:

> Q. Now, to your knowledge, for example, if physical evidence is obtained in a case, such as blood evidence or firearms or things of that nature, these items of physical evidence are not physically given to the Defense; is that correct?
>
> A. Correct.
>
> Q. They make an appointment and they come look at it?
>
> A. Yes, ma'am.
>
> Q. Or they come with the State and they come look at it?
>
> A. Yes, ma'am.
>
> Q. And because this is primary evidence of your work, that is maintained in the same fashion as other physical evidence?
>
> A. Yes, ma'am.
>
> Q. So there's no difference between that and other physical evidence that would be proffered in a criminal case?
>
> A. Yes, ma'am.

15

Over the course of multiple hearings, the only evidence that Morris's trial attorneys established had not been "disclosed" to them in this case was the raw data that Detective Jablon had extracted from the two cell phones he had been given. But Hassibi acknowledged in his testimony that he was aware of Detective Jablon's report, which stated that "no extensive exam was performed" and that the extracted data would be maintained on the ECU servers. And, at any rate, based on Detective Jablon's testimony at the hearing that he was "not guaranteed to get anything different" if he ran the raw data through a new rendition of Cellebrite and that it was possible that he might get even less data, the trial court was well within its discretion to find that running the undisclosed raw data through a newer version of the software would not yield anything "material" within the ambit of Article 39.14(a).[11] *See id.* art. 39.14(a) (limiting discovery, under that subsection, to "things not otherwise privileged that constitute or contain evidence *material* to any matter involved in the action" (emphasis added)); *Watkins v. State*, 619 S.W.3d 265, 269 (Tex. Crim. App. 2021) ("Evidence is 'material' if it has 'some logical connection to a consequential fact.'"). Based on the same testimony and by the same reasoning, the trial court could

---

Morris's attorneys made no showing that they had even attempted to come look at the phones or the extracted data that Detective Jablon had reported would be maintained on the ECU servers.

[11]We are not saying that raw data extracted from a cell phone can never be "material" as that term is used in Article 39.14, only that—in this particular case—the defense failed to establish that there was anything "material" in the raw data that had not been previously disclosed.

16

have reasonably found that there was no "exculpatory, impeachment, or mitigating" evidence in the undisclosed raw data that would bring it within the ambit of Article 39.14(h). *See* Tex. Code Crim. Proc. Ann. art. 39.14(h).

The burden is always upon the party seeking a continuance to show himself entitled to it. *Smith v. State*, 22 S.W.2d 665, 666 (Tex. Crim. App. 1929). Morris came up well short of meeting that burden. But he also failed to show with specificity that the trial court's denial of his Motion for Continuance resulted in actual prejudice to his defense. *See Janecka*, 937 S.W.2d at 468; *Heiselbetz*, 906 S.W.2d at 511–12. Although he filed a Motion for New Trial,[12] it appears that no hearing was held on that motion, and Morris did not introduce any additional evidence—not even the raw data that he eventually obtained—into the record to show how he was prejudiced by the denial of his Motion for Continuance.[13] His appellate contentions on this prong are entirely speculative:

---

[12]Morris did not allege any violations of Article 39.14 or mention the trial court's denial of his requested continuance in his Motion for New Trial.

[13]Detective Jablon testified at the December 11 hearing on Morris's Motion for Continuance that "it would probably take maybe ten minutes" per extraction to take the raw data that he had obtained and process it through a new Cellebrite system and "[m]aybe a day [or] a day and a half" for him to manually compare the data on an old run and a new run so that he could see only what was new or different between the two files. The trial court denied the Motion for Continuance on December 11, 2023, and denied the defense's renewed motion the next day. Morris was sentenced on December 19, 2023. He filed his Motion for New Trial on January 9, 2024. By rule, the trial court had until March 3, 2024, which was 75 days after it had imposed Morris's sentence in open court, to rule on the Motion for New Trial before it was overruled by operation of law. *See* Tex. R. App. P. 21.8(a). Because March 3, 2024,

Amongst the text messages extracted from the complainant's phone were messages hinting at drug distributions, which *could have been explored* more thoroughly had Article 39.14 of Michael Morton been more fully recognized.

Moreover, during a hearing regarding certain text and Facebook communications between La[B]rittany Moore and [Morris], and between [Morris] and Tyron Mitts [that] occurred in the weeks prior to the murder, communications admitted at trial [that] were damaging to [Morris] were in the main uncontroverted, as any exculpatory evidence capable of refuting the State's allegations that [Morris] was upset that LaBrittany had moved on to another relationship was still locked into the seized (but substantially unsearched) cellphones in the possession of Detective Jablon. . . . While some of the communications from [Morris] could be construed to be threatening, had [Morris] been provided with all the discovery efforts mandated by Article 39.14 of Michael Morton, exculpatory and explanatory evidence *could have been* obtained and used at trial.

. . . . Had Article 39.14 been more fully observed in this case, or had the State provided the evidence required by Article 39.14 under Michael Morton, in all likelihood other, exculpatory evidence *would have been* discovered sufficient to rebut the harmful and damaging cellphone evidence seized by the police. [Emphasis added.]

As for the first of these contentions, Morris provides no citations to the record in support of his statement that "messages hinting at drug distributions" were extracted from Cooley's phone, *see* Tex. R. App. P. 38.1(i), and we have located no

_____

was a Sunday, the period of time for the trial court to rule on the Motion for New Trial was extended to Monday, March 4, 2024. *See* Tex. R. App. P. 4.1(a). Thus, Morris had ample time to obtain any additional evidence from the cell phones and present it to the trial court before the trial court's plenary power over his case expired. *See State ex rel. Cobb v. Godfrey*, 739 S.W.2d 47, 49 (Tex. Crim. App. 1987) (orig. proceeding) (explicitly declining to apply Texas Rule of Civil Procedure 329b(e), which provides trial courts with an additional thirty days of plenary power after the seventy-five-day period has expired and a motion for new trial has been overruled by operation of law, to criminal cases); *see also* Tex. R. Civ. P. 329b(e).

such text messages in the record. Regarding Morris's second contention, nobody was in a better position to know the contents of his phone than Morris himself, and he did not put forth any evidence in support of his Motion for Continuance that his cell phone data contained exculpatory and explanatory evidence that was not disclosed, as he now suggests. And his third and last contention—that "other, exculpatory evidence would have been discovered sufficient to rebut the harmful and damaging cellphone evidence seized by the police"—is just rank speculation, and the law "requires more than this type of speculation to justify an appellate reversal of a case for a trial court's failure to grant a continuance."[14] *Renteria*, 206 S.W.3d at 702.

Finally, nothing Morris argues on appeal shows that he was harmed by not sooner receiving the raw data from the phones that were forensically examined. *See Massimo v. State*, 144 S.W.3d 210, 214 (Tex. App.—Fort Worth 2004, no pet.) (concluding that the appellant had "shown no harm in obtaining [requested] e-mails on the Monday of trial instead of the Friday before trial," where "the only reason articulated by defense counsel to the court as to his need for the e-mails was to hire an

---

[14]Morris's arguments to the trial court were similarly speculative:

It *could change* the complete nature of the case simply because if you have a deleted file that is in the bin file and we haven't seen -- and that was something -- one of these phones is one of the State's witness's who has culpability I think in the situation -- that there *might be* information, exculpatory information, that we should have been provided long ago when I filed that first motion, over three years ago. . . .

. . . . *It could mean* a big difference in the outcome of this case *depending on what the contents are*. [Emphasis added.]

19

expert to determine their source[, a]n expert c[ould] be retained without the contents of the e-mails, and [the defense had] waited until seventeen days before trial" to request emails). It does not appear from the record that he even secured a ruling from the trial court on his motion to have his own expert independently examine the phones or that the defense expert ever conducted such an examination. Morris has not shown (or even argued) that "the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial"—the essence of showing trial-court error. *Gonzales*, 304 S.W.3d at 843. Morris also has not shown "with considerable specificity" how the denial of a continuance actually prejudiced his defense. *Id.* at 842–43. We conclude that Morris has not satisfied either prong of the abuse-of-discretion test, and we overrule his first point.

## B. Motion to Suppress

In Morris's second point, he argues that the trial court erred in overruling his Motion to Suppress and that the trial court's erroneous denial of his Motion to Suppress was harmful. The State does not discuss harm in its brief but argues that the trial court correctly denied Morris's Motion to Suppress.

### 1. Applicable Law and Standard of Review

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). A defendant seeking to suppress evidence on Fourth

Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980); *State v. Martinez*, 569 S.W.3d 621, 623 (Tex. Crim. App. 2019). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or was otherwise reasonable, if warrantless. *Martinez*, 569 S.W.3d at 624.

A detention may be justified if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1879–80 (1968); *Johnson v. State*, 622 S.W.3d 378, 384 (Tex. Crim. App. 2021). An officer conducts a lawful temporary detention when he reasonably suspects that an individual is violating the law. *See Johnson*, 622 S.W.3d at 384. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Id.* This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017). The facts adduced to give rise to a reasonable suspicion need not show that a person has committed, is committing, or is about to commit a particular and

distinctively identifiable penal offense. *Derichsweiler v. State*, 348 S.W.3d 906, 916–17 (Tex. Crim. App. 2011).

Thus, the law recognizes three distinct types of interactions between the police and citizens: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests—the most intrusive of Fourth Amendment seizures—that are reasonable only if supported by probable cause. *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013).

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede*, 214 S.W.3d at 24–25, we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281. Whether the totality of circumstances supports reasonable suspicion or probable cause is a legal determination we review de novo. *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008).

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we infer the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819. Here, the trial court did not make explicit fact findings on the record, and neither party timely requested findings and conclusions.

## 2. The Suppression Hearing

Prior to trial, Morris moved to suppress "[a]ny and all tangible evidence seized by law enforcement officers or others in connection with [his] detention and arrest . . . , . . . any testimony by the Police Department or any other law enforcement officers or others concerning such evidence," and any "testimony as to the illegal detention and search of [Morris] and seizure of evidence from the vehicle and search." He claimed that he had been illegally arrested, searched, and seized by the Arlington Police Department and Texas Department of Public Safety (DPS) and that evidence that the State intended to use at trial was illegally obtained as a result of this "illegal arrest, search[,] and seizure."

23

At the mid-trial hearing on Morris's Motion to Suppress, Detective Hall testified that on May 4, 2020, a BOLO had gone out for a vehicle associated with Morris. The BOLO described the vehicle as a white Nissan Altima and included the full license plate number "and also the damage to the vehicle." It also contained the name "Kendell Morris" and a description of him.

DPS Trooper Robert Arellano testified that on the morning of May 4, 2020, he was on Interstate 45 in Madison County when he received a BOLO for a white Nissan Altima coming down from Arlington with a black male driver. Shortly thereafter, he saw a vehicle matching the description in the BOLO drive past his position in the median in one of the southbound lanes. He immediately pulled onto the interstate, caught up with the vehicle, and saw that it had bumper damage, which he testified was part of the BOLO. As soon as he ran the Texas registration and the license plate, he "saw the alert per Arlington PD in the return of the vehicle."

After confirming "per the registration return" that the vehicle was the same as the one described in the BOLO,[15] Trooper Arellano followed the Altima as it exited the interstate. He testified that he "turned on [his] overhead red and blue lights." Footage from Trooper Arellano's dashcam and body camera were admitted in evidence for the purpose of the hearing. Consistent with Trooper Arellano's

---

[15]Trooper Arellano testified that when he ran the vehicle's license plate number, it showed Morris as "an associated person" but not the registered owner. Trooper Arellano explained that Morris's traffic history and criminal history, including an outstanding warrant out of Harrison County, showed up when he checked his driver license number.

24

testimony, the video showed the driver of the Altima pulling into a gas station off the access road and, as he pulled up to a pump, activating the car's hazard lights but then taking off as soon as Trooper Arellano got out of his patrol unit. Trooper Arellano immediately got back in his car and followed the Altima as its driver drove through an adjacent parking lot and then slowed down before reaching the service road. Trooper Arellano witnessed a black male, whom he later identified as Jones, exit the passenger side with his hands up.

Trooper Arellano chose to stay with the person who had just exited rather than continue to pursue the suspect vehicle. He "gave a vague description of the vehicle to two officers[ from MCSO who had stopped at the gas station], telling them [its] last known location." He placed Jones in his patrol unit and drove "[m]aybe two miles further south" down the access road to catch up to where the officers were with the Altima. By the time he had caught up to them, Morris had been stopped, secured, and identified. Trooper Arellano testified that he knew that "Kendell Jerrell Morris" was wanted out of Arlington on suspicion of murder.

Officer Tyler Ogle testified that he was employed as a sergeant with the MCSO on May 4, 2020. He was aware that the Arlington Police Department was looking for a suspect vehicle, and although he could not recall the details of that BOLO by the time of trial, he testified that he did know those details on May 4, 2020. He testified that he was out with MCSO investigator Jason Lorenz when they observed Trooper Arellano pulling a vehicle over at a gas station across the street. The vehicle that was

pulled over fit the description from the BOLO that Officer Ogle had heard earlier. Officer Ogle saw Trooper Arellano get out of his patrol car with his long gun "and/or rifle" out and then run back to his patrol car. Officer Ogle "called pursuit" for Trooper Arellano over the radio.

Officer Ogle and Investigator Lorenz followed Trooper Arellano and the suspect vehicle through the gas station parking lot in their own patrol vehicle. They paused by Trooper Arellano's vehicle, and Trooper Arellano directed Officer Ogle, who was driving, to go "in the direction of the feeder road and Interstate Highway 45 southbound" towards the suspect vehicle. Officer Ogle and Investigator Lorenz "were able to catch the vehicle on the . . . southbound side of the [interstate] feeder road, . . . [p]robably less than a mile" from the gas station. Officer Ogle testified that he and Investigator Lorenz "initiated basically a felony stop" because the suspect was committing the crime of evading arrest and detention with a motor vehicle and also because the vehicle "was the possible suspect vehicle of that BOLO." They had their patrol vehicle's lights and sirens on, and the driver of the suspect vehicle stopped the car and immediately put his hands out the window. Officer Ogle and Investigator Lorenz exited their car and started giving commands to the driver to get out, but the driver said that he could not get out because the car was still in drive and there was a rifle inside the vehicle.

Officer Ogle testified that he and Investigator Lorenz opened the passenger-side door and that Investigator Lorenz retrieved the rifle, which was

wrapped in a black jacket, from the passenger-side floorboard and secured the rifle on the hood of their patrol vehicle. He then came back to the suspect vehicle and was able to put it in park, whereupon they had the driver exit and placed him under arrest. Officer Ogle and Investigator Lorenz conducted a search incident to arrest[16] and found the black bag containing the magazines and unspent ammunition inside the vehicle. Officer Ogle testified that the search incident to arrest was conducted "because of the nature of what the BOLO was out for" but that he did not do a thorough search of the car at that point:

> We didn't know if there was any other evidence inside that vehicle, you know, that could be tied to, you know, whatever case was going on in Arlington at the time. So we basically had that vehicle towed. We shut it back up, didn't touch it anymore, towed it to the sally port of the sheriff's office and let it set until Arlington PD got there.

Officer Ogle testified that he and Investigator Lorenz secured the rifle in their patrol vehicle and took it back to the station and that it was in a secure place from then on until Detective Hall arrived to take custody of it. Detective Hall testified that she went down to Madisonville that afternoon, met with Officer Ogle and Investigator Lorenz, and took custody of the rifle. She also testified that the Altima was stored in Madison County's secured garage and then towed from that location by

---

[16]Once an officer has probable cause to arrest, he may search the accused incident to the arrest. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003) Whether the arrest occurs immediately before or after the search is irrelevant as long as the officer has sufficient probable cause. *State v. Ballard*, 987 S.W.2d 889, 892 (Tex. Crim. App. 1999).

Kelly McKnight, which was the wrecker service used by the City of Arlington, back to a secured impound lot at the police station in Arlington.

On May 5, 2020, Detective Hall obtained a search warrant for the Altima and an arrest warrant for Morris. Both warrants were admitted in evidence for purposes of the hearing. In her supporting affidavit attached to the arrest warrant, Detective Hall referenced two witnesses as "Witness #1" and "Witness #2." Her affidavit stated that "Witness #2, who [was] fully identified, believed to be credible, and available to testify, observed a white Nissan Altima backed into a parking space in front of their apartment building prior to the offense. Witness #2 identified the Nissan Altima as having driver-side rear bumper damage." At the suppression hearing, Detective Hall identified "Witness #2" as Clinton Cook.[17] She also testified that the search warrant was obtained before the Arlington Police Department searched the Altima.

The defense recalled Trooper Arellano, and his police report was admitted in evidence for the purpose of the hearing. After hearing the arguments of counsel, the trial court denied Morris's Motion to Suppress.

---

[17]At this point in the trial, Cook had already testified that he was living in the Bardin Greene Apartments in Arlington in May 2020 and that, between 8:00 and 9:00 in the morning on May 4, 2020, he saw "a white car, a Nissan Altima," with "a broken back bumper" backed up next to his car. He had also testified that he saw a young black man reclined in the front passenger seat of the car. He further testified that, once he had returned to his apartment, "[w]ithin about ten minutes . . . heard gunshots."

## 3. Discussion

Morris does not argue that Officer Ogle and Investigator Lorenz lacked probable cause to arrest him on May 4, 2024. He also does not challenge the probable-cause determinations supporting the warrants that Detective Hall obtained on May 5, 2020. Rather, he argues that "the initial traffic stop effected by Trooper Arellano was not supported by reasonable suspicion or probable cause" and was therefore unreasonable and violative of the Fourth Amendment and Article I, Section 9 of the Texas Constitution.[18] He concedes that "[t]he detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists," *see Derichsweiler*, 348 S.W.3d at 914, a statement of law that the State repeats in its brief. But Morris contends that, based on the testimony at the suppression hearing, "the collective knowledge of the police in the case at bar did not include specific, articulable facts that, when combined with rational inferences from those facts, would

---

[18]Although Morris invoked both the United States and Texas Constitutions in his Motion to Suppress and cites both the Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution in his appellate brief, he does not argue that Article I, Section 9 provides greater protections against unreasonable searches and seizures than the Fourth Amendment, nor does he cite any authority on this point. When an appellant's argument is based on both the federal and state constitutions but does not provide any argument compelling a different conclusion under the state constitution, we review only the federal arguments. *See Welch v. State*, 93 S.W.3d 50, 52 & n.5 (Tex. Crim. App. 2002). Therefore, we analyze Morris's second point as a federal constitutional issue only.

29

lead one to reasonably conclude" that he "was, had been, or soon would be engaged in a criminal activity" at the time that Trooper Arellano conducted his felony traffic stop at the gas station in Madisonville. We disagree.

First, Trooper Arellano did not "seize" Morris when he pulled into the gas station. A "seizure" under the Fourth Amendment does not occur until (1) a reasonable person would believe he or she was not free to leave and (2) the person being seized has either yielded to the officer's show of authority or been physically forced to yield. *Johnson v. State*, 912 S.W.2d 227, 236 (Tex. Crim. App. 1995). When a suspect refuses to yield to physical force or an officer's show of authority, there is no seizure. *State v. Castleberry*, 332 S.W.3d 460, 469 (Tex. Crim. App. 2011).

Morris mentions these points of law in his brief, but he contends that he "did initially yield to Trooper Arellano's authority, even though [he] did eventually drive off again." The State argues that Morris did not submit to Trooper Arellano's authority, and accordingly, no seizure occurred at that time. Here again, we must agree with the State.

It is unclear from Trooper Arellano's dashcam video—or any other evidence at the hearing on Morris's Motion to Suppress—when exactly Morris first became aware of Trooper Arellano's presence behind him. If Morris was unaware of Trooper Arellano's presence outside his vehicle, then he could not have yielded to any show of authority. *See Robinson v. State*, No. 02-21-00113-CR, 2022 WL 3453549, at *4 (Tex. App.—Fort Worth Aug. 18, 2022, no pet.) (mem. op., not designated for

30

publication) (citing *York v. State*, 342 S.W.3d 528, 534 n.16 (Tex. Crim. App. 2011)). The only commands Trooper Arellano issued at the time were to bystanders, not Morris.[19] In fact, as soon as Trooper Arellano started shouting, Morris began to drive away. Trooper Arellano testified at the hearing that "the car was not in park." Based on our de novo review of this application-of-law-to-fact question, we conclude that the trial court did not err by denying Morris's Motion to Suppress because Morris did not yield to Trooper Arellano's authority and thus was not "seized" under the Fourth Amendment until Officer Ogle and Investigator Lorenz stopped him. *See California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 1550–51 (1991) (holding that a seizure does not occur when the subject does not yield to an officer's show of authority); *Johnson*, 912 S.W.2d at 232, 234–35; *Johnson v. State*, 864 S.W.2d 708, 715 (Tex. App.—Dallas 1993) ("The mere approach of police officers that does not interfere with one's freedom of movement and causes only minimal inconvenience and loss of time is not a seizure."), *aff'd*, 912 S.W.2d 227 (Tex. Crim. App. 1995).

But even if the trial court concluded that Morris *had* yielded to Trooper Arellano's authority, Trooper Arellano had a reasonable suspicion to conduct a temporary investigative detention. The facts here are similar to those in *Woodward v. State*, in which the appellant was suspected of killing his former girlfriend

---

[19]On the video from Trooper Arellano's dashcam—as soon as he got out of his patrol unit at the gas station—Trooper Arellano can be heard on the video shouting to bystanders, "Guys! Hey! Get out of the way!" This is consistent with his report and his testimony at the hearing.

at her residence in Austin. 668 S.W.2d 337, 338 (Tex. Crim. App. 1982). Less than two hours after the deceased had been killed, an Austin-originated bulletin was received by the sheriff's office in Columbus, Texas. *Id.* "The 'BOLO' was for a '1979 Silver Corvette SPB 714 driven by Paul Woodward W/M 26–28' and requested, 'If located, hold for questioning ref to homicide occ. this city app. 2:30 am . . . .'" *Id.* As a sheriff's dispatcher was reading the bulletin, she received a transmission from a peace officer in LaGrange that the described automobile had been spotted there en route to Columbus. *Id.* She relayed this information to all available units, and a Colorado County deputy sheriff responded by proceeding to the intersection of Highway 71 and Highway 90 in Columbus. *Id.* He soon saw the Corvette, pulled in behind it to confirm its license number, and then turned on his overhead lights and stopped the appellant. *Id.* at 338–39.

On original submission, the Court of Criminal Appeals reversed the appellant's conviction on the ground that the deputy's arrest of appellant on "only the strength of the BOLO and his own confirmation of the license number" violated the appellant's constitutional rights,[20] *id.* at 341, but on rehearing, the Court held that "a minimal showing ha[d] been made that the facts and circumstances within the collective knowledge of the officers involved and of which they had reasonably trustworthy

---

[20]The Court reviewed the deputy's seizure of the appellant as an arrest requiring probable cause, *see Woodward*, 668 S.W.2d at 339–41, a higher standard than reasonable suspicion, *see Wade*, 422 S.W.3d at 667; *Torres v. State*, 182 S.W.3d 899, 901–02 (Tex. Crim. App. 2005).

information were sufficient to warrant a person of reasonable caution in the belief that [the] appellant had committed an offense" and affirmed the appellant's conviction, *id.* at 346, 347 (op. on reh'g). The Court established a rule in Texas jurisprudence:

> We hold, therefore, that when there has been some cooperation between law enforcement agencies or between members of the same agency, the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved is to be considered in determining whether there was sufficient probable cause therefor.

*Id.* at 344.[21] The uncanny similarities between the facts leading up to the deputy's stop of the appellant in *Woodward*, a case which is binding precedent upon this court, and the facts leading up to Trooper Arellano's initial encounter with Morris in this case can lead us to no other conclusion but that Trooper Arellano had probable cause—and, therefore, reasonable suspicion—to seize Morris when he pulled into the gas station.

---

[21]The Court has continued to reaffirm this "collective knowledge" doctrine in the decades since *Woodward* and has made clear that, "when several officers are cooperating, their cumulative information may be considered in assessing reasonable suspicion *or* probable cause." *Martinez,* 569 S.W.3d at 626–27 (emphasis added). In *Martinez,* the Court held that "evidence of communication between officers is not always a necessary requirement to apply the collective knowledge doctrine." *Id.* at 627. But, like the *Martinez* Court, we need not "go to the outer limits" of the collective knowledge doctrine in this case. Detective Hall testified at the hearing that she provided the information from which the BOLO was formed. That BOLO was communicated to Madison County and to Trooper Arellano. Thus, the collective knowledge doctrine applies in this case just like it did in *Woodward* and *Martinez.*

Morris contends that "the officers' individualized description from the witness stand [at the suppression hearing] utterly failed to set forth with any consistency what information was included in the BOLO," but the record does not support his contention. The only inconsistency in the testimony of the witnesses at the suppression hearing that he specifically identifies in his brief is that Detective Hall testified that the BOLO issued for the white Nissan included the license plate number, whereas Trooper Arellano testified that the BOLO on the white Nissan did not include a license plate number and that he had to close with the Nissan in order to read its license plate number and enter that plate number into his database. We defer to the trial court's resolution of this factual conflict in the testimony. *See Martinez*, 570 S.W.3d at 281. Detective Hall's and Trooper Arellano's testimony about the BOLO was otherwise consistent. Both witnesses testified that it contained a description of Morris and described the vehicle he was driving as a white Nissan Altima with damage to the rear bumper.

Further, Trooper Arellano's report stated that a "Madison County dispatcher" had advised him "of a BOLO . . . per Arlington P.D. in reference to a murder that took place at approximately 0845 involving B M Kendell Jerrell Morris, DOB [date of birth omitted], and a specific vehicle he was last seen in," which "was vaguely described as a damaged, white Nissan passenger car." Morris's second point is overruled.

34

## III. CONCLUSION

Having overruled both of Morris's appellate points, we affirm his conviction and sentence.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 3, 2025